**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:25-CV-00218-CRS-CHL**

**JOSEPH J.,[1]** **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY, [2]** **Defendant.**

**REPORT AND RECOMMENDATION**

Before the Court is the Complaint filed by Plaintiff, Joseph J. ("Claimant"). Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). (DN 1.) This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation. (DN 11.) Claimant filed an opening brief, and the Commissioner filed a Fact and Law Summary.[3] (DNs 14, 16.) Claimant did not file a reply, and his time to do so has expired. (DN 11.) Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. FINDINGS OF FACT

On or about January 7, 2022, Claimant filed an application for disability insurance benefits under Title II ("DIB"). (R. at 18, 59, 69-70, 80, 182-92.) His application alleged disability beginning on January 7, 2021, due to asthma, sleep apnea, depression, diabetes, problems walking,

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.
[2] As Frank Bisignano is now the Commissioner of Social Security, he is automatically substituted as the Defendant in this matter pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to change the case caption to reflect the substitution.
[3] Claimant did not file a completed Fact and Law Summary form as required by the Court's Social Security Order. (DN 11.) Claimant's counsel is instructed to carefully review and comply with the Court's Social Security Order in future cases.

and anxiety. (*Id.* at 18, 59, 69-70, 80, 213.) Claimant's applications were denied initially and again on reconsideration. (*Id.* at 86-90, 98-101.)

At Claimant's request, Administrative Law Judge ("ALJ") Gonzalo Vallecillo ("the ALJ") conducted a hearing on Claimant's application on September 15, 2023. (*Id.* at 37-58, 106-08.) Claimant and his counsel appeared by telephone. (*Id.* at 39, 146-47.) An impartial vocational expert also participated in the hearing. (*Id.* at 39-40.) During the hearing, Claimant's attorney summarized in his opening statement that Claimant suffered from depression following the loss of his child and had since put on about one hundred pounds. (*Id.* at 41-42.) Claimant testified to the following. He only drives during the day because his vision is bad at night. (*Id.* at 43.) He only leaves his house to go to the doctor and has not been going anywhere else. (*Id.*) He explained that being around crowds gives him severe anxiety; his heart rate goes up and he has to go out to his car to calm down for approximately twenty minutes. (*Id.* at 43-44.) Sometimes he even has to reschedule appointments. (*Id.* at 44.) He doesn't go to church or do anything with crowds due to his anxiety. (*Id.* at 49.) Sometimes he is manic from being bipolar and will stay awake for two or three days, but other times he sleeps continuously. (*Id.* at 46.) He currently weighs 320 pounds but had previously weighed 400 pounds prior to his gastric bypass surgery. (*Id.* at 44-45.) He has been a diabetic for approximately two years, checks his blood sugar daily, and wears an electronic glucose monitor. (*Id.* at 45.) He also has sleep apnea and uses a CPAP machine. (*Id.*) His weight gain has caused him back issues and trouble with his knees. (*Id.* at 48, 50.) He has asthma, wheezes a lot, carries an inhaler around with him all the time, and uses a nebulizer three to four times per day. (*Id.* at 45, 47.) He cannot walk for a block without wheezing, and if he walks around, he has to sit awhile due to his asthma and wheezing. (*Id.* at 47.) He sometimes needs help getting dressed, showering, and tying his shoes. (*Id.*) He can wash dishes, but his wife does the

grocery shopping because of his anxiety around crowds. (*Id.* at 49.) He watches television but doesn't read because he has dry eyes due to his sugars. (*Id.* at 50.)

The ALJ issued an unfavorable decision on December 29, 2023. (*Id*. at 15-36.) Applying the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled, the ALJ made the following findings. First, Claimant had not engaged in substantial gainful activity since January 7, 2021, the alleged onset date. (*Id*. at. 20.) Second, Claimant had severe impairments including asthma, obesity, and post-traumatic stress disorder. (*Id*. at 21.) Third, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment from 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id*.) Fourth, Claimant had the residual functional capacity ("RFC") to perform light work subject to the following exceptions:

> [he can] lift and/or carry 20 pounds occasionally; lift and/or carry 10 pounds frequently; stand and/or walk six hours in an eight-hour workday; and sit six hours in an eight-hour workday. The claimant may never climb ladders/ropes/scaffolds and occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. The claimant must avoid all exposure to hazards. He is able to understand, carry out, and remember simple, routine, and repetitive tasks involving only simple, work-related decisions with the ability to adapt to routine workplace changes. The claimant could tolerate frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with the general public. He will be off-task five percent (5%) of the day and miss one workday per quarter.

(*Id*. at 23.) Fifth, and finally, considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform. (*Id*. at 29.) The ALJ concluded Claimant had not been under a disability, as defined in the Social Security Act, from January 7, 2021, through the date of his decision. (*Id*. at 31.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on February 14, 2025. (*Id.* at 1-7, 179-81, 280-82.) At that point, the ALJ's

decision became the final decision of the Commissioner. *See* 20 C.F.R. § 422.210(a) (2025); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later. 20 C.F.R. § 422.210(c). Accordingly, Claimant timely filed this action on April 16, 2025. (DN 1.)

## II. CONCLUSIONS OF LAW

The Social Security Act authorizes payments of DIB to persons with disabilities. *See* 42 U.S.C. §§ 401-434. An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a) (2025).

### A. Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to

follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

**B. Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. § 404.1520 (2025). In summary, the evaluation process proceeds as follows:

(1) Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[4] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4) Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the

[4] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509 (2025).

Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

**C. Claimant's Contentions**

Claimant made only one argument: that the ALJ's analysis of the opinion of his treating nurse practitioner, Lizette Nji, NP ("NP Nji"), did not comport with 20 C.F.R. § 404.1520c. (DN 14, at PageID # 5541-48.) The applicable regulations set forth specific rules an ALJ must follow with regard to opinion evidence. Pursuant to 20 C.F.R. § 404.1520c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[5] 20 C.F.R. § 404.1520c(a) (2025). Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(a), (c). The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions." 20 C.F.R. § 404.1520c(a), (b)(2). However, the regulations state that "it is not administratively feasible for [an ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions . . . in [the] case record"; thus, an ALJ is not required to explicitly discuss how he or she weighed the factors of relationship with the claimant,[6]

[5] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions. 20 C.F.R. § 404.1527(c)(2) (2025).
[6] In assessing this factor, the regulations require an ALJ to consider the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship. 20 C.F.R. § 404.1520c(c)(3).

specialization, and other factors.[7] 20 C.F.R. § 404.1520c(b)(1)-(2). Where two medical opinions reach different conclusions but are "equally well-supported . . . and consistent with the record," an ALJ is required to state how he or she considered the other "most persuasive" factors in making his or her decision. 20 C.F.R. § 404.1520c(b)(3).

The Sixth Circuit has not elucidated a specific standard aside from the text of the regulation to determine whether an ALJ sufficiently complied with the requirement to "articulate how [he or she] considered the medical opinions" and "explain how [he or she] considered the supportability and consistency factors" under the new regulations. 20 C.F.R. § 404.1520c(b). *But see Gregory v. Comm'r of Soc. Sec.,* No. 26-5022, 2026 WL 1763752, at *2 (6th Cir. June 18, 2026) (quoting in part 20 C.F.R § 404.1520c(b)(2)) ("To pass muster, the ALJ need only explain 'how [he] considered the supportability and consistency factors for a medical source's medical opinions.' "); *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (noting that the new regulations "substantially reduce[] the ALJ's obligation to explain the basis for his or her assessment of medical opinions"); *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 822 (6th Cir. 2020) (White, J. dissenting) (applying the new regulations and finding that "[t]he ALJ did not clearly analyze the supportability and consistency of the state consultants' assessments, as compared to other evidence in the record which supported [the plaintiff]'s claims"). However, district courts applying the new regulations within this circuit consistently apply the articulation requirement literally. *See, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 909 (E.D. Mich. 2021) ("The administrative adjudicator has the obligation in the first

[7] The regulations provide that an ALJ will consider any "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c)(5). These factors include, but are not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim," "whether new evidence [] receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive," and whether the medical source has "an understanding of [the] disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(5).

instance to show his or her work, i.e., to explain in detail *how the factors actually were applied* in each case, to each medical source. Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that obligation." (emphasis in original)); *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning."); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20-CV-1364, 2021 WL 119287, at *1 (N.D. Ohio Jan. 13, 2021) (finding that "the [new] regulations do require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions").

Here, Claimant began treating with NP Nji on January 5, 2023. (R. at 3883-86.) NP Nji noted Claimant's complaints of weight gain, panic attacks, excessive worrying, racing thoughts, forgetfulness, self-isolation, anhedonia, poor concentration and intrusive thoughts, among others. (*Id.* at 3884.) At his second visit on January 18, 2023, Claimant reported that his medications were not working well despite his compliance to his regimen. (*Id.* at 3881.) At his third visit on February 2, 2023, Claimant continued to report self-isolation, social anxiety, irritability, and hallucinations, and NP Nji noted that Claimant's "entire regimen[ ] need[ed] adjustment." (*Id.* at 3878.) At his next visit on February 15, 2023, NP Nji noted Claimant's continued complaints of irritability and inability to sleep and commented that his medications were somewhat effective. (*Id.* at 3873.) But by March 9, 2023, Claimant reported doing "much better." (*Id.* at 3868.) At a March 28, 2023, visit, NP Nji noted that Claimant was tolerating his medications well. (*Id.* at 3865.) Regarding an April 26, 2023, visit, NP Nji noted that Claimant's medications were

effectively controlling his symptoms though he did experience some breakthrough symptoms. (*Id.* at 3860.)

But at Claimant's next May 23, 2026, visit, Claimant reported suicidal ideations and that he would be better off dead. (*Id.* at 3854.) NP Nji noted that Claimant's medications were not effectively controlling his symptoms and that Claimant needed inpatient care. (*Id.*) Claimant was admitted to Peace Hospital for suicidal ideations and depression that same day. (*Id.* at 5158, 5291, 5295.) Claimant was discharged three days later. (*Id.* at 5149.) Claimant saw NP Nji again on June 7, 2023, at which time he reported that Xanax had been effective in controlling his anxiety and panic though he stated that he was depressed. (*Id.* at 3848.)

Claimant saw NP Nji again on June 12, 2023, at which time she documented that Claimant was tolerating his medications well and denied any side effects. (*Id.* at 3843.) At a June 19, 2023, visit, NP Nji noted that Claimant was responding effectively to his medications and denied distress, suicidal ideations, depressed mood, and anxiety. (*Id.* at 3840.) As of July 6, 2023, the last visit by Claimant to NP Nji in the record, NP Nji again noted that Claimant's medications were not effectively managing his symptom and that he was having trouble sleeping and experiencing depression though he was not using one of his medications as ordered. (*Id.* at 3837.)

Throughout the entire six-month period that Claimant saw NP Nji, despite Claimant's reports of symptoms and hospitalization, NP Nji documented many normal mental status findings including orientation to person, place, and time; appropriate appearance; appropriate dress; unremarkable motor activity; appropriate interview behavior; normal speech; intact memory; and unremarkable thought progress. (*Id.* at 3836, 3839, 3842, 3847, 3853, 3859, 3864, 3867, 3872, 3877, 3880, 3883.) NP Nji documented Claimant's mood as anxious, depressed, and irritable half the time but euthymic half the other half. (*Id.*) She also noted that Claimant displayed a

combination of congruent and appropriate affect. (*Id.*) She documented his insight as fair at two early visits in January but otherwise good, and his judgment as fair on two occasions in January and one occasion in April but otherwise good. (*Id.*) She noted Claimant's attention and concentration to be "variable" once in January 2023 but "good" at every other visit. (*Id.*) She listed Claimant as experiencing delusions, paranoia, and auditory and visual hallucinations in January and early February 2023 but then consistently documented Claimant's thought content as appropriate and his perception as unremarkable for the rest of Claimant's visits. (*Id.*) Finally, while she listed his functional status as "mildly impaired" in January 2023, from February to June 2023, NP Nji marked Claimant's functional status as "intact." (*Id.*)

On June 8, 2023, NP Nji provided an opinion regarding Claimant's functioning. (*Id.* at 1100-05.) NP Nji provided her opinion on a check-box form and wrote that Claimant had begun care with her in January 2023, visiting monthly. (*Id.* at 1100.) She listed Claimant's response to treatment as "partially effective," emphasizing that he needed monthly follow up for monitoring and medication adjustments. (*Id.*) In response to a directive that she describe her clinical findings, she wrote only "[s]evere psychosis with negative comments on patient's life." (*Id.*) She opined that his prognosis was "guarded" as "treatment will be life long." (*Id.*) She marked boxes on the form to indicate that Claimant had symptoms including anhedonia, decreased energy, thoughts of suicide, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, apprehensive expectation, paranoid thinking/inappropriate suspiciousness, seclusiveness/autistic thinking, bipolar syndrome, hallucinations/delusions, emotional lability, manic syndrome, sleep disturbance, and recurrent severe panic attacks. (*Id.* at 1101.) She checked boxes on the form to opine that Claimant was unable to meet competitive standards, defined as "noticeable difficulty . . . from 21 to 40 percent of the workday or work week," in his ability to "[w]ork in coordination

with or proximity to others without being unduly distracted"; "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes"; and "[t]ravel in unfamiliar place[s]." (*Id.* at 1102-03.) She marked that Claimant was seriously limited, defined as "noticeable difficulty . . . from 11 to 20 percent of the workday or week," in his ability to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances"; "[s]ustain an ordinary routine without special supervision"; "[m]ake simple work-related decisions"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; "[a]ccept instructions and respond appropriately to criticism from supervisors"; "[r]espond appropriately to changes in a routine work setting"; "[d]eal with normal work stress"; "[b]e aware of normal hazards and take appropriate precautions"; "[d]eal with [the] stress of semiskilled and skilled work"; "[i]nteract appropriately with the general public"; and "[u]se public transportation." (*Id.*) She also marked that Claimant had a limited but satisfactory ability, defined as "noticeable difficulty . . . no more than 10 percent of the workday or work week," to "[r]emember work-like procedures"; "[u]nderstand and remember very short and simple instructions"; "[c]arry out very short and simple instructions"; "[m]aintain attention for [a] two hour segment"; "[a]sk simple questions or request assistance"; "[u]nderstand and remember detailed instructions"; "[c]arry out detailed instructions"; "[s]et realistic goals or make plans independently of others"; "[m]aintain socially appropriate behavior"; and "[a]dhere to basic standards of neatness and cleanliness." (*Id.*) She rated Claimant's abilities as "unlimited or very good" in none of the twenty-five listed abilities/aptitudes. (*Id.*) Despite opining as to significant limitations, NP Nji left blank the sections of the form giving her space to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support

[her] assessment." (*Id.*) She then ultimately opined that Claimant had a "marked" functional limitation as to his difficulty "maintaining social functioning" and "maintaining concentration, persistence or pace" and that he had a "moderate" functional limitation in "[r]estriction of activities of daily living." (*Id.* at 1104.) She wrote that Claimant's impairments would cause him to be absent more than four days of work per month. (*Id.* at 1105.) In response to a question asking her to "[p]lease describe any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," she wrote, "None." (*Id.*)

In his decision, the ALJ found NP Nji's opinion not persuasive. (*Id.* at 28.) He criticized the opinion for being a "checkbox form" that "endorsed the most significant limits in many areas without citation to objective evidence and without support in treatment notes." (*Id.*) He emphasized that NP Nji's form opinion didn't provide any "actual functional limitations." (*Id.*) He explained that NP Nji's opinion was inconsistent with the rest of the record, which contained findings of good and intact attention and concentration; normal/euthymic mood and affect; normal and appropriate behavior; normal speech; effective and good eye contact; and Claimant presenting as pleasant, cooperative, and polite. (*Id.* (citing *id.* at 317, 320, 324, 342, 347, 350, 458-59, 465, 471, 478, 482, 676, 680, 713, 902, 1110, 1581, 3836, 5123, 5130, 5131).) In his main RFC analysis, the ALJ had also contrasted Claimant's normal mental status findings with findings that, at times, Claimant was depressed, had irritable mood, had a tearful affect, had erratic concentration, was easily distracted, had poor insight, had flight of ideas, and had somewhat tangential thought content, including citations to NP Nji's opinion as to both abnormal and normal findings. (*Id.* at 26 (citing *id.* at 317, 320, 324, 342-43, 347, 350, 361, 458-59, 465, 471-72, 478, 482, 488, 496, 503, 634, 676, 680, 713, 716, 901-02, 908, 922, 1110, 1581, 3836-37, 3843, 3859, 5100, 5120, 5123-24, 5130-31).) The ALJ emphasized that when Claimant was complaint with

his medications, he reported doing better and/or well. (*Id.* at 27 (citing *id.* at 349, 5106).) The ALJ summarized that abnormal mental status findings were infrequent, Claimant treated conservatively with therapy and medication, and Claimant often had normal mental status evaluations. (*Id.* at 27 (citing *id.* at 317, 320, 324, 342, 347, 350, 458, 465, 471, 478, 482, 676, 680, 713, 716, 902, 1110, 1581, 3836, 3859, 5123-24, 5130).)

Claimant argued that the ALJ's discussion of NP Nji's opinion was not sufficient to comport with the regulatory requirements for a variety of reasons including the it was superficial and unsupported by the record. (DN 14, at PageID # 5541-48.) However, the majority of his arguments are more akin to a challenge to the substance of the ALJ's conclusions rather than a procedural challenge that the ALJ did not do the required analysis. In either case, the undersigned disagrees and finds that the ALJ properly discussed both the supportability and consistency factors as required by 20 C.F.R. § 404.1520c and that his discussion is supported by substantial evidence.

As to supportability, which relates to the "objective medical evidence and supporting explanations presented by a medical source [] to support his or her medical opinion(s)," 20 C.F.R. §§ 404.1520c(c)(1), the ALJ properly noted that NP Nji completed a check box form that endorsed significant limitations without any sufficient supporting explanation. (R. at 28.) However, she left blank the sections of the form where she could have provided supporting explanation for her opined limitations. (*Id.* at 1102-03.) Even under the old opinion evidence regulations, an ALJ was not "bound by the conclusory statements of physicians, particularly where the statements [we]re unsupported by detailed objective criteria and documentation in the medical record, and [we]re inconsistent with the rest of the evidence." *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016). The Sixth Circuit has "declined to give significant weight to rudimentary indications that lack an accompanying explanation," and an opinion of that kind is patently

deficient such that errors in the ALJ's discussion of it can qualify as harmless error.[8] *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (collecting cases); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). Thus, contrary to Claimant's argument, it was appropriate for the ALJ to rely on the conclusory nature of NP Nji's checkbox opinion when considering the persuasiveness of the same. (DN 14, at PageID # 5544-45.) Claimant argued that NP Nji's opinion was more than a checkbox form because "she did identify several symptoms that Mr. Jackson suffered from." (*Id.* at 5544.) However, NP Nji's opinion failed to link those symptoms in any meaningful way to her opinions as to Claimant's functioning, a failing that it was proper for the ALJ to take into consideration. Claimant argued that the ALJ should not have restricted his supportability analysis "to the four corners of the assessment" and that NP Nji's own records supported her opinion, which should have been addressed by the ALJ. (*Id.* at 5546.) But the ALJ did address NP Nji's treatment notes, stating in his analysis that NP Nji's opinion lacked "support in [her] treatment notes." (R. at 28.) Thus, the ALJ properly considered those notes in addition to her opinion. Notwithstanding any lack of specific citation to portions of those notes specifically in his supportability analysis, the ALJ's overall characterization of them is supported by the undersigned's review of NP Nji's records—several of which the ALJ did cite elsewhere in his decision—which contain objective findings that do not fully support the level of limitation opined by NP Nji. For example, despite opining that Claimant could not meet competitive standards in terms of his ability to "[w]ork in coordination with or proximity to others without being unduly distracted" and had marked "[d]ifficulties in maintaining concentration, persistence, or pace," her treatment notes documented appropriate interview behavior, intact memory, and good attention and concentration. (*Compare id.* at 1102-

[8] Notably, though these cases were decided under the old rules governing opinion evidence in 20 C.F.R. § 404.1527, their logic is equally persuasive under the new regulations.

04, *with id.* at 3836, 3839, 3842, 3847, 3853, 3859, 3864, 3867, 3872, 3877, 3880, 3883.) Claimant's argument is nothing more than an attempt to have the Court reweigh the evidence. Because the undersigned finds the ALJ's supportability analysis supported by substantial evidence, the undersigned finds it inappropriate to do so.[9] *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). The undersigned also finds Claimant's procedural argument regarding the sufficiency of the ALJ's articulation without merit because the ALJ's reference to the checkbox nature of NP Nji's opinion and his commentary regarding her treatment notes were sufficient to comport with the requirements of 20 C.F.R. § 404.1520c.

Regarding consistency, which concerns the relation of a medical source's opinion to "the evidence from other medical sources and nonmedical sources in the claim," 20 C.F.R. § 404.1520c(c)(2), as noted above, the ALJ emphasized various mental status findings in the remainder of the record that he found inconsistent with NP Nji's opined limitations, including findings of good and intact attention and concentration; normal/euthymic mood and affect; normal and appropriate behavior; normal speech; effective and good eye contact; and Claimant presenting as pleasant, cooperative, and polite. (R. at 28 (citing *id.* at 317, 320, 324, 342, 347, 350, 458-59, 465, 471, 478, 482, 676, 680, 713, 902, 1110, 1581, 3836, 5123, 5130, 5131).) Claimant argued

---

[9] Claimant also argued that that ALJ's observation that NP Nji did not provide actual functional limitations was factually incorrect. (DN 14, at PageID # 5544.) Claimant then argued that NP "Nji's opinions about whether [ ] [Claimant] could perform work-related activities should be considered medical opinions as they provide specific functional limitations." (*Id.*) But the ALJ did not state that NP Nji failed to provide a medical opinion, and he addressed her opinion based on the required regulatory factors in his written decision. His statement that her opinion did not contain "actual functional limitations" was only one part of that analysis. (R. at 28.) Claimant's brief did not provide a definition of the term functional limitations, and the undersigned finds it unnecessary to reach the issue because the remainder of the ALJ's analysis is sufficient standing alone to comport with the requirements of 20. C.F.R. § 404.1520c. Thus, even assuming for the sake of argument that Claimant was correct, the undersigned finds that any error was in fact harmless because the remainder of the ALJ's supportability discussion comported with the regulatory requirement and was supported by substantial evidence. *See Sparks v. Kijakazi,* No. 2:21-CV-102-DCP, 2022 WL 4546346, at *11 (E.D. Tenn. Sept. 28, 2022) (discussing the application of the harmless error in the context of 20 C.F.R. § 404.1520c). In other words, any error in the ALJ's statement that NP Nji's opinion did not contain actual functional limitations did not prejudice Claimant on the merits or otherwise deprive her of substantial rights. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (citing *Connor v. U.S. Civil Serv. Comm'n,* 721 F.2d 1054, 1056 (6th Cir. 1983)).

that the ALJ's list of citations were not actually pertinent to NP Nji's opinions. (DN 14, at PageID # 5547-48.) For example, Claimant noted that NP Nji "did not opine that [ ] [Claimant] would be unable to sustain attention and concentration" or "would be unable to meet competitive standards when maintaining attention for two-hour segments." (*Id.* at 5547.) He emphasized that the ALJ's listing of findings without connecting them to any perceived inconsistency did not constitute sufficient analysis to allow the Court to trace the path of his reasoning. (*Id.* at 5547-48.) But Claimant's argument reads the ALJ's decision too narrowly. It also ignores other portions of NP Nji's opinion that are relevant to the particular findings cited by the ALJ like her opinion that Claimant was experiencing "[d]ifficulty thinking or concentrating" and that Claimant had "marked" "[d]ifficulties in maintaining concentration, persistence, or pace." (R. at 1101, 1104.) When the ALJ's decision, and in particular his RFC analysis, is read as a whole, the ALJ's consistency analysis is adequately supported without any such logical deficiency as Claimant argued. The ALJ stated that when Claimant was complaint with his medications, he generally reported doing better and/or well; abnormal mental status findings were infrequent; Claimant's treatment was largely conservative consisting of therapy and medication; and Claimant's mental status evaluations were largely normal. (*Id.* at 23-29.) This analysis is supported by numerous citations by the ALJ to the record. Claimant's brief's overview of the record does not sufficiently call into question the ALJ's conclusions and is—much like his supportability argument above—merely an attempt to have the Court reweigh the evidence. Claimant pointed the Court to no large bodies of contradictory evidence the ALJ failed to consider or explain. Instead, the ALJ appears to have merely weighed the evidence and come to a conclusion opposite the one Claimant would have preferred. But because the undersigned finds the ALJ's consistency analysis supported by substantial evidence—the threshold for which is "not high," *Biestek v. Berryhill*, 587 U.S. 97, 102-

03 (2019) (citing *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938))—it would be inappropriate for the undersigned to consider whether "substantial evidence would also have supported the opposite conclusion." *Gayheart*, 710 F.3d at 374. Thus, based upon a reading of the ALJ's decision as a whole, the undersigned finds the ALJ's interpretation of the record and his consistency analysis both supported by substantial evidence and a sufficient articulation to comport with the requirements of 20 C.F.R. § 404.1520c.

Because the undersigned has not found that Claimant demonstrated any error in either the ALJ's compliance with 20 C.F.R. § 404.1520c or his substantive conclusions, the undersigned recommends that the final decision of the Commissioner be affirmed.

## III. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

Colin H Lindsay, Magistrate Judge
United States District Court

cc: Counsel of record
July 28, 2026

**<u>Notice</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Civ. P. 72(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).